Argued and submitted September 6, decision of Court of Appeals affirmed as modified; order of circuit court reversed; case remanded to circuit court for further proceedings November 15, 2002

Gary Lee MIDDLETON,
*Respondent on Review,*

*v.*

Mary Jean CHANEY,
aka Jeannie M. Chaney,
*Respondent,*

*and*

Jerry CUMMINGS
and Patricia Cummings,
*Petitioners on Review.*

In the Matter of the Guardianship of
Brad Lee MIDDLETON,
*Ward.*

(CC 97-DR-1197, 96-P-0237; CA A108878; SC S49145)

57 P3d 893

James M. Brown, of Enfield Brown Knivila & Razor, Salem, argued the cause and filed the brief for petitioners on review.

Ryan S. Joslin, Mt. Vernon, argued the cause for respondent on review.

Before Gillette, Presiding Justice, and Durham, Riggs, De Muniz, and Balmer, Justices.**

GILLETTE, P. J.

** Carson, C. J., and Leeson, J., did not participate in the consideration or decision of this case.

## GILLETTE, P. J.

Petitioners (uncle and aunt) seek review of a Court of Appeals decision that terminated their guardianship of a child whom they have reared since 1996 and awarded custody of the child to his father. *Middleton v. Chaney*, 177 Or App 679, 34 P3d 722 (2001). We agree with the Court of Appeals that the guardianship should be set aside. However, for the reasons that follow, we hold that any award of custody to father is premature. We therefore modify the decision of the Court of Appeals in that respect, and remand the matter to the trial court for further proceedings.

We take the following undisputed facts from the Court of Appeals opinion and from the record. Child was born on July 2, 1990. Mother and father never married, but father attended prenatal appointments with mother and was present at child's birth. Father lived with mother in Grants Pass for the first 10 months of child's life. On May 1, 1991, father began serving a six-and-one-half-year prison sentence for manufacturing drugs. For about two years, father was able to maintain a relationship with child from prison. During that time, he telephoned child and sent letters and small presents.

After a time, however, father and mother's relationship deteriorated, and contact between father and mother lessened. Father tried to continue his relationship with child through mother's sister-in-law but that, too, proved difficult. Eventually, father became aware that mother was neglecting child and tried, unsuccessfully, to intervene.

By 1996, mother had developed a serious alcohol problem, and she and child were virtually homeless. In August 1996, mother's uncle and aunt, who then lived in Washougal, Washington, agreed to take child on a three-week fishing trip. When they picked up child in southern Oregon, they observed that child appeared to be in very poor condition: at six years old, he was very small and weighed only 32 pounds; he appeared to be malnourished; and his baby teeth were rotten. When uncle and aunt returned to southern Oregon with child at the end of the trip, they learned through an intermediary that mother had left word that she could not care for child and had requested that uncle

and aunt keep him. They agreed and returned with child to Washington.

Uncle and aunt recognized that child needed prompt medical attention. Accordingly, they hired a lawyer and petitioned the Josephine County Circuit Court to have themselves appointed as child's guardians, so that they could cover child under their insurance and enroll child in school. In their petition, uncle and aunt averred that the identity of child's father was unknown. In their haste, they made no serious effort to ascertain father's identity and to locate him, as ORS 125.060 and ORS 125.065 require.[1] Mother supported the petition, and the court appointed uncle and aunt as child's guardians on October 30, 1996. Child has lived with them since that time.

---

[1] ORS 125.060 provides, in part:

"(1) The notices required by this section must be given to all persons whose identities and addresses can be ascertained in the exercise of reasonable diligence by the person required to give the notice.

"(2) Notice of the filing of a petition for the appointment of a fiduciary or entry of other protective order must be given by the petitioner to the following persons:

"* * * * *

"(b) The spouse, parents and adult children of the respondent."

ORS 125.065 provides, in part:

"(1) * * * Notice of a petition must be personally served on the parents of a respondent if the petition is based on the fact that the respondent is a minor. * * *.

"(2) Except as provided in subsection (1) of this section, the notices required under ORS 125.060 may be mailed to the last-known address of the person. If the address or identity of any person is not known and cannot be ascertained with reasonable diligence, notice of the filing of a petition may be given by publishing at least once a week for three consecutive weeks a copy of the notice in a newspaper having general circulation in the county where the hearing is to be held. * * *"

Uncle and aunt testified at trial that they limited their inquiry concerning father's identity to reviewing child's birth certificate, which states that the father was unknown, and asking mother once whether she knew who the father was. They claim that she responded that she was not sure. The birth certificate lists child's last name as that of father and not of mother, but uncle and aunt did not inquire further of any other family members, many of whom lived nearby and knew father's identity and whereabouts. Neither did they publish notice of the filing of the petition for guardianship in any newspaper. Uncle and aunt have not contended that their efforts to notify father were sufficient to meet the requirements of ORS 125.060 or ORS 125.065.

Father learned that child was living with uncle and aunt in December 1996. He wrote and telephoned them, but they were not receptive to his efforts. They immediately arranged with prison authorities to have their telephone number removed from the list of numbers that father was permitted to call. That action effectively cut off father's access to child while he was in prison.

Father was released into a community corrections facility in July 1997. He then filed a *pro se* motion to terminate uncle and aunt's guardianship, along with a petition to obtain custody of child. In December 1997, father was released from community corrections, moved into a three-bedroom house in Grants Pass with his 24-year-old daughter and her six-year-old daughter, and began work as an electrician.

In October 1998, father moved for summary judgment on his motion and petition. Uncle and aunt did not appear at the hearing on the summary judgment motion or otherwise oppose father's guardianship termination motion or his petition for custody. Nevertheless, the trial court declined to award father summary judgment. The court observed that uncle and aunt's guardianship over child had been in place for two years at that point and concluded that, in that circumstance, the court could not terminate the guardianship in the absence of a finding that it would be in the child's best interest to do so. Accordingly, the court consolidated the matters that father raised in 1997 with uncle and aunt's earlier guardianship proceeding and conducted a trial in the consolidated cases in May 1999.

At trial, father argued, among other things, that the guardianship was void as to him because of the lack of notice. Uncle and aunt did not join that issue directly, but introduced evidence that child had been thriving in their care for quite some time and that father was a virtual stranger to child.

The trial court ruled, without extended statutory analysis, that uncle and aunt had been "duly appointed guardians" of child at the earlier guardianship proceeding. It also ruled that terminating the guardianship and awarding

custody of child to father "would be highly detrimental to the psychological well-being of the child," because "there is no strong attachment between the biological father and the child at this time." The court denied father custody and continued the guardianship.

Father appealed the trial court's ruling to the Court of Appeals. Father argued that the trial court erred in failing to hold that the original guardianship was void because uncle and aunt had not given father proper notice, that the trial court erred in considering one of the statutory criteria for terminating a guardianship (best interest of the child) when the guardianship never was valid in the first place, and that the trial court erred in failing to grant his unopposed summary judgment motion.

As noted, the Court of Appeals reversed. That court held that uncle and aunt's failure to make a diligent effort to search for father was fatal to their guardianship. 177 Or App at 683. In so concluding, the court rejected uncle and aunt's assertion that they had "substantially complied" with the requirements of ORS 125.060 and ORS 125.065, the notice provisions of the guardianship statute, inasmuch as father eventually had had an opportunity to show why the court should terminate the guardianship. *Id.* at 684-85. The Court of Appeals observed that the "substantial compliance" doctrine operates as a substitute for literal compliance with a statutory notice requirement when a person has received actual notice and, therefore, has suffered no prejudice as a result of the technical deficiency. The court stated that, in the context of a guardianship over a child, the purpose of the notice requirement is to allow a parent to participate in a proceeding that determines his or her child's fate. In the present case, father did not receive actual notice of the guardianship proceeding until well after it occurred. As a result, he did not have a chance to question whether a guardianship was necessary, to influence the choice of guardians, or to request that the court impose conditions on the guardianship. The court stated that "[l]ack of notice to father, therefore, was much more than a technical deficiency that did not interfere with the purpose of the statute: It was a significant, prejudicial error that utterly negated that purpose." *Id.* at 685.

The Court of Appeals then turned to consider the consequences of the failure to notify father. The court observed that the guardianship statute itself does not specify particular consequences of the failure to notify a parent. *Id.* However, according to the Court of Appeals, this court's decision in *Hughes v. Aetna Casualty Co.*, 234 Or 426, 383 P2d 55 (1963), provides guidance in that regard. In *Hughes*, this court held that a decree of adoption was void as to a biological mother who was not served with notice of the pending adoption and there was no notice by publication, as applicable statutes required. The Court of Appeals determined that the same result should obtain here and held, therefore, that uncle and aunt's guardianship over child was void as to father. 177 Or App at 686. Then, without further analysis, the court stated: "That being the case, father has custody." *Id.* We allowed uncle and aunt's petition for review.

■ Uncle and aunt repeat their "substantial compliance" argument in this court, essentially contending that the fact that father had an opportunity to argue, in 1999, that circumstances existing at that time did not necessitate a guardianship ought to overcome the fact that uncle and aunt failed to notify father in 1996 of the initial guardianship proceeding. The couple dispute the relevance of this court's decision in *Hughes*, asserting that it is critical that the trial court found that it is in the child's best interest to remain with them. However, they offer no statutory or decisional support for their position that the trial court had the authority to ignore their failure to comply with the requirements of ORS 125.060 and ORS 125.065, declare that uncle and aunt were child's "duly appointed guardians," and continue the guardianship.

As noted above, ORS 125.060(1) provides that, in a protective proceeding, including one to establish a guardianship over a child, appropriate notices "*must* be given to all persons whose identities and addresses can be ascertained in the exercise of reasonable diligence." (Emphasis added.) Specifically, ORS 125.060(2)(b) provides that such notices "*must* be given by the petitioner to * * * [t]he * * * *parents*" of the person for whom entry of a protective order is sought. (Emphasis added.) Moreover, ORS 125.065(1) provides that

that notice *"must be personally served* on the parents of" the person for whom entry of a protective order is sought, if that person is a minor.

■      It is undisputed that uncle and aunt could have ascertained father's identity and address with reasonable diligence. Under ORS 125.060, then, notice to father of uncle and aunt's 1996 petition for guardianship was mandatory. ORS 125.065 required uncle and aunt to serve father personally with notice of the pending guardianship proceeding. They did not do so.[2] We agree with the Court of Appeals' recitation of the prejudice that father suffered as a result of that failure to notify. Had father been permitted to participate in the guardianship proceeding from the outset, he might not have been the "total stranger" to child that the trial court declared him to be after the May 1999 trial. For that reason, we also agree with the Court of Appeals that uncle and aunt's failure to provide notice to father of the pending guardianship proceeding rendered the guardianship award void as against father's later challenge to its validity.

As noted, the Court of Appeals, having concluded that uncle and aunt's guardianship of child was void as to father, ended its inquiry and directed the trial court to enter an order granting custody to father. That was the relief that father had requested. In their petition for review, uncle and aunt rebuke the Court of Appeals for failing to take child's present needs and interests into account, but they still do not offer a theory of their own, apart from their continued insistence on the validity of the guardianship, for maintaining the status quo.

■      Notwithstanding the limited help that we have received on the issue from uncle and aunt, we agree with them that the Court of Appeals' peremptory disposition of the case was premature. In our view, the question whether the invalidity of the guardianship leads inexorably to the conclusion that custody of child reverts to father is one that the trial judge should address first. That court is in the best position

---

[2] As noted, they also did not publish notice of the pending petition for guardianship in any newspaper, which ORS 125.065(2) required them to do in the event that they could not ascertain father's identity or whereabouts.

to determine the present circumstances, and to apply the law that is pertinent to those circumstances. We therefore modify the decision of the Court of Appeals in that respect.[3]

The decision of the Court of Appeals is affirmed as modified. The order of the circuit court is reversed. The case is remanded to the circuit court for further proceedings.

---

[3] In so doing, we express no view as to the appropriate disposition. We note in passing that there might be other legal avenues for resolving the issue. *See, e.g.,* ORS 109.119(1) (allowing "[a]ny person * * * who has established emotional ties creating a child-parent relationship" to petition court for order recognizing and accommodating such relationship).